THE BRINTON.[1]

FISHER et al. v. THE BRINTON.

(District Court, S. D. New York. December 16, 1893.)

COLLISION—STEAM AND SAIL—VESSELS MEETING—CHANGE OF COURSE BY SAILING VESSEL—FAILURE TO REVERSE BY STEAMER.

Where a schooner, sailing free, and a tug, met and collided in Arthur kills, and the evidence showed that prior to the collision the schooner, wholly without necessity, had altered her course so as to cross the course of the tug, it was *held* that the schooner was liable for the collision. But as the tug, which had been going at a high rate of speed, failed to reverse at all, though a reversal, even for a short time, might have avoided the collision, it was *held* that the tug also was in fault, and the damages should be divided.

In Admiralty. Libel by Peter Fisher and another against the steam tug Brinton to recover damages for a collision. Decree for divided damages.

[1] Reported by E. G. Benedict, Esq., of the New York bar.

Wing, Shoudy & Putnam, for libelants.
Robinson, Biddle & Ward, for respondent.

BROWN, District Judge. Between 11 and 12 o'clock on the night of September 5, 1893, as the libelants' oyster sloop Marietta, of 11 tons, and about 30 feet long, was coming up the Kills from Rahway river, bound for New York, she was run into by the steam tug Brinton, going down, light, and sunk, for which the above libel was filed.

The collision was in the northerly reach of the Kills, a passage about 600 feet wide, along the upper part of Duncan or Chelsea island, and between that and the Jersey shore. The Brinton's red light was seen from the sloop a half mile distant, and probably while the Brinton was heading more to the westward, and before her turn to go south at the head of Chelsea island. Afterwards, both the colored lights of the tug were seen for a short time, and then the green light just before collision. Both sides agree that the collision was on the New Jersey side of the channel way, and that the angle of collision was considerable; the libelants say about four points; the respondents, about seven points, the stem of the tug striking the sloop upon her starboard side a little aft of the fore rigging. Each strenuously insists that no change was made in its course.

The libelants, both of whom were on board, testify that the tug's lights were seen a little on the sloop's starboard bow; but I cannot place entire reliance upon this testimony, from the fact that the lookout forward took all his observations, except when the tug was very near, from near the starboard rail, from which point he was very liable to mistake as to whether the tug was a little on the starboard bow or a little on the port bow. Both witnesses from the tug, on the other hand, state that the sloop was seen from a point to a point and a half on the tug's port bow. Neither light of the sloop was seen, and she was first recognized by her sails, seen from 500 to 1,000 feet distant. The tug was going down the channel, about one-third of the distance across from the Jersey shore, at the rate of about 10 miles an hour. The pilot testifies she was going straight down the channel; and going so near to the Jersey shore, and at that speed, it is incredible that the tug should have been headed much, if at all, toward the Jersey shore.

The considerable angle of the collision could not, therefore, have been brought about, except in consequence of the heading or yawing of the sloop towards the Jersey shore. And this would reconcile nearly all the testimony. It would place the tug on the schooner's starboard bow, though she was, in fact, a little to the eastward of the line of the tug. It would explain the fact that neither the pilot nor the lookout of the tug saw the red light of the schooner, because, on that heading, it was not exposed to their view, and the green light which was 10 feet above the deck, in the rigging, was probably obscured by the jib. It explains also the angle of collision, and shows that the sloop crossed the course of the tug by heading to the westward, and thus brought about the collision. This is rendered less

improbable, by the fact that the sloop was not steered by compass, nor by any definite landmarks. The sloop had a free wind well aft of abeam. Her place was on the right-hand side of the channel; the place of the tug was on the other side. The tug was perceived, at first, to be going down on that side, and in that narrow passageway, the sloop was blamable for going over, wholly without necessity, towards the Jersey shore. Had attention been given to her course, and her lights, I am confident it would have been seen that both lights were obscured from the tug, and that it was the sloop's duty to show her red light in time to the tug.

Though the sloop is in fault for navigating unnecessarily in the way of the tug, and so as to obscure both her lights, I think the tug must also be held to blame, if not for failure to see the sails of the sloop earlier, at least for not reversing at all. The rule of navigation absolutely requires this, and I cannot accept as a sufficient excuse the claim of the pilot that he did not know which way the sloop was going. The engineer testifies that he could reverse in three seconds; and a reversal for a very short period would have detained the tug enough to permit the sloop to pass on some 15 or 20 feet further, whereby this collision would have been avoided.

For these reasons, I find both to blame; and the libelants are entitled to only one-half of their damages and costs.